UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| THE BURLINGTON NORTHERN SANTA FE RAILWAY COMPANY | *CIVIL NO. 06-1358 |
| VERSUS | *MAGISTRATE JUDGE HILL |
| PARKER DRILLING OFFSHORE USA, LLC., ET AL. | *BY CONSENT OF THE PARTIES |

## REASONS FOR JUDGMENT

Pending before the court are the cross Motions for Summary Judgment filed by Parker Drilling Offshore USA, LLC ("Parker") and Browning Oil Company, Inc. ("Browning").[1] [rec. docs. 53 and 56]. Each Motion is considered by the court as opposition to the opposing party's Motion. Oral argument on the Motions was held on October 11, 2006, and the matter was taken under advisement.[2] [rec. doc. 68].

The instant lawsuit was filed by BNSF Railway Company ("BNSF") for damages to the Bayou Boeuf Railroad Bridge (the "Bridge") which was struck by a vessel known as Parker Drilling Rig #21-B (the "Rig"). The Rig was owned by Parker. At the time of the allision, the Rig had been contracted to Browning for use near Lake Verrett. In anticipation of Hurricane Katrina, the Rig was moved from Lake Verrett. The intended destination of the Rig was the Bollinger Shipyard in Amelia, Louisiana, which is listed in the contract between Parker and Browning as both the "mobilization" and "demobilization" point.  (¶ 4.1 and 4.2).

---

[1] Browning's Opposition to Parker's Motion for Summary Judgment has been construed as a Cross Motion for Summary Judgment. *See* rec. doc. 61.

[2] All parties consented to the exercise of this Court's jurisdiction by the undersigned.  *See* rec. doc. 60 .

Because of the nearness of the approaching hurricane, the Rig was unable to reach its destination because the Bridge was closed, and, accordingly, could not be elevated for the Rig's passage.  The Rig was therefore moored at A & B Industries Shipyard docks, near the Bridge.  When Hurricane Katrina came ashore, on August 29, 2005, the Rig became detached from its moorings and allided with the Bridge causing the damage sought to be recovered by the BNSF in the main demand.

In its Complaint and Amended Complaint, BNSF named both Parker and Browning as defendants.  Thereafter, Parker filed a cross-claim against Browning for defense and indemnity pursuant to the contract existing between them.  The main demand was settled; the indemnity claim between Parker and Browning remains before this court.

The contract at issue is a standardized IADC contract (the "contract") .[3]  Parker is named as the "contractor" and Browning is named as the "operator."  The contract obligates Parker to furnish the equipment and labor to drill a well for Browning in search of oil or gas on a "daywork basis." In return, Section 4 of the contract provides that Browning will pay Parker specified "daywork rates." The "operating day rate" is $22,500.00. (¶ 4.4).  While there is no daywork rate specified during "mobilization" or "demobilization", "during the time the rig is in transit to or from a drill site" a "moving rate" of $20,250.00 per day is applicable; however,

---

[3] The International Association of Drilling Contractors Drilling Bid Proposal and Daywork Drilling Contract form.

"infield moves are the full dayrate", $22,500.00. (¶ 4.3). The contract does not define either the term "mobilization" or "demobilazation." However, the contract provides that Browning is,

> "... responsible for marine equipment required to mobilize rig to location. Dayrate begins when rig arrives at location. Mobilization point: Amelia, La." (¶ 4.1).

Similarly, with respect to "demobilization" Browning is,

> "... responsible for marine equipment required to demobilize rig. Dayrate shall cease when tanks and compartments are cleaned & rig is free floating & clear of keyway on *final well*. Demobilization point: Amelia, La."
> (¶ 4.2) (emphasis added).

Section 14 of the contract at issue, entitled "Responsibility for Loss or Damage, Indemnity, Release of Liability and Allocation of Risk", contains the following language:

> 14.13 Indemnity Obligation: Except as otherwise expressly limited herein, it is the intent of the parties hereto that *all indemnity obligations and/or liabilities assumed by such parties under terms of this Contract*, including, without limitation, Paragraphs 14.1 through 14.12 hereof, *be without limit and without regard to the cause or causes thereof ... the negligence of any party or parties, whether such negligence be sole, joint or concurrent, active or passive.* The indemnities, releases and assumptions of liability extended by the parties hereto under the provisions of Paragraph 14 shall inure to the benefit of the parties, their parent, holding or affiliated companies and their respective officers, employees, agents and servants. The terms and provisions of Paragraphs 14.1 through 14.12 shall have no application to claims or causes of action asserted against Operator or Contractor by reason of any agreement of indemnity with a person or entity not a party hereto. (emphasis added).

During oral argument, the parties agreed that the language in paragraph 14.13 is sufficiently specific so as to allow an indemnitee to recover from the indemnitor for the indemnitee's own fault.

The contract also includes "Special Provisions" contained in Exhibit "A" to the contract. (*See* ¶ 23). These provisions include provisions set forth in Section 7 of Exhibit "A" under the heading "Contractor's Other Provisions", and provide, in pertinent part, as follows:

> 7.04 **Hurricane/Severe Weather**:
> In the event that it should become necessary to cease rig operations due to hurricane conditions, or other severe weather, Contractor's [Parker's] dayrate beginning when the last employee evacuated from rig reaches shore base and ends when first employee returns to rig shall be $20,250.00 per day. *Operator [Browning] will be responsible for tug costs and rig moving rate if conditions require the rig to be moved off of Operator's [Browning's] location to safe harbor and back again.* (emphasis added).

> \*   \*   \*

> 7.06 Operator [Browning] *shall be responsible for guidance and supervision during mobilization and demobilization into and away from field and directing rig on and off location.* Responsibility for these services, access routes *and all damages* (including oyster settlements and sea grasses) *caused by mobilization or demobilization of rig* and marine equipment *shall be borne by Operator [Browning].* (emphasis added).

> \*   \*   \*

> 7.19 In case of conflict between Exhibit "A" and any other provisions, Exhibit "A" will govern.

In its Motion, Parker argues that paragraph 7.06 when read in conjunction with paragraph 14.13 requires Browning to defend and indemnify Parker for all damages sought by BNSF herein, even if those damages were caused by Parker's sole negligence. That is because,

4

Parker asserts, the movement of the Rig from Lake Verett toward Amelia, Louisiana in anticipation of Hurricane Katrina was a "mobilization" or "demobilization" as contemplated by the contract.

Initially, Browning argued that paragraph 14.13 was a "catch-all" provision applicable *only* to the indemnity provisions listed in section 14 of the contract. Browning then argued that, because paragraph 7.06 did not contain language requiring Browning to indemnify Parker for Parker's own negligence, strictly construing the language of paragraph 7.06 (as required to impose a defense and indemnity obligation on Browning), resulted in no obligation on Browning's part to either defend or indemnify Parker. Further, Browning asserted that the lack of indemnity language in paragraph 7.06 conflicted with the broad scope of the indemnity obligations in Section 14 of the contract and, therefore, under paragraph 7.19, the language in paragraph 7.06 (which, Browning argued, imposed no such obligation) controlled. [rec. doc. 56].

In its supplemental memorandum [rec. doc. 67], and more particularly during oral argument, Browning largely abandoned that position, and rather argued that while paragraph 7.06 applied to "mobilization" and "demobilization" of the Rig, the movement at issue herein was neither a "mobilization" nor a "demobilization" of the Rig as contemplated by the contract, and therefore paragraph 7.06 did not govern the Rig movement at issue herein. Rather, the more specific provision, paragraph 7.04, governed temporary relocation of the Rig to a safe harbor during a hurricane. That provision contains no indemnity provision or any language

5

regarding allocation of responsibility for damages caused during Rig movement due to a hurricane. Accordingly, Browning claims that it does not owe Parker defense nor indemnification for the damages sustained by BNSF asserted herein.

For the following reasons, the Motion for Summary Judgment filed by Parker is **DENIED**, and the Motion for Summary Judgment filed by Browning is **GRANTED.**

## Motion for Summary Judgment Standard

Fed.R.Civ.Proc. Rule 56(e) provides, in pertinent part, as follows:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Browning's Motion for Summary Judgment is properly made and supported. Thus, Parker may not rest upon its allegations or denials in its pleadings, but rather must go beyond the pleadings and designate specific facts demonstrating that there is a genuine issue for trial. *Celotex v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553-54 (1986).

However, metaphysical doubt as to the material facts, conclusory allegations, unsubstantiated assertions, and those supported by only a scintilla of evidence are insufficient. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Additionally, summary judgment is mandated against a party who fails to make a showing sufficient to establish an essential element of that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 106 S.Ct. at 2552.

The parties assert, and the court agrees, that there are no material facts at issue in this case. The issue to be determined is solely one of contractual interpretation. Accordingly, summary judgment is proper.

## LAW AND ANALYSIS

The parties do not dispute that the contract at issue is a maritime contract governed by maritime law. Indeed, the parties selected the general maritime law the United States as the law governing the interpretation and enforcement of the contract. *See* ¶ 18. Moreover, during oral argument, the parties agreed that the following general principles of contractual interpretation are applicable to the contract at issue herein. Under maritime law, the contract must be read and interpreted as a whole, including the exhibits and attachments thereto; the words of the contract are to be given their plain and ordinary meaning. *Davis v. Gulf Oil Corp*, 919 F.2d 313, 315 (5th Cir. 1991); *Louisiana Land and Exploration Co. v. Offshore Tugs, Inc*., 23 F.3d 967, 969 (5th Cir. 1994). As a general rule of contractual interpretation, a more specific provision will control over a more general conflicting provision. *Baton Rouge Oil and Chemical Workers' Union v. Exxon Mobile Corp*., 289 F.3d 373, 377 (5th Cir. 2002); *United Postal Service v. American Postal Worker's Union,* 922 F.2d 256, 260 (5th Cir. 1990); *See also Consolidated Grain & Barge Co., Inc. v. Capital Marine Supply, Inc.*, 2001 WL 823737, *3 (E.D.La. 2001) *citing Marine Overseas Services. v. Crossocean Shipping Co.*, 791 F.2d 1227, 1234 (5th Cir.1986) (noting that maritime contracts are subject to the general rules of contractual interpretation).

Indemnity provisions in maritime contracts, including provisions which indemnify a party for its own negligence, are permissible, and should be construed to cover "all losses, damages, or liabilities which reasonably appear to have been within the contemplation of the parties." *Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 540 (5th Cir. 1986) *quoting Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 333 (5th Cir. 1981).  However, indemnity provisions which purport to protect an indemnitee against the consequences of his own negligence are strictly construed and will not be enforced unless the obligation is clearly and unequivocally expressed. *Corbitt*, 654 F.2d at 333; *Todd Shipyards Corp. v. Turnbine Service, Inc.*, 674 F.2d 401, 416 (5th Cir. 1982); *Seal Offshore, Inc. v. American Standard, Inc.*, 736 F.2d 1078, 1081 (5th Cir. 1984).

For the reasons set out below, the undersigned concludes that the contract is not sufficiently specific so as to require Browning to indemnify Parker for Parker's own fault and alleged negligence in connection with the movement of the Rig at issue herein.

Initially, the court notes that both Parker and Browning are sophisticated business entities which have vast experience in the oilfield industry and, hence, are fully capable of bargaining for, and allocating, the risks involved in their business relationships.  That is exactly what was done in this case; the parties each agreed to accept certain risks and liabilities in accordance with their knowledge and understanding of the oilfield industry, and in accordance with the legal principles set forth above.

Section 14 of the contract sets forth the general allocations of risk and provides for indemnity between the parties. Paragraph 14.13 unquestionably provides for indemnification by Browning to Parker for Parker's acts of negligence in certain circumstances. While that paragraph is, in essence, a "catch-all" provision, it is not limited solely to those allocations of risk set forth in the preceding paragraphs of Section 14 as Browning suggested in its original pleadings. [rec. doc. 56 – 1]. To the contrary, the language of the paragraph belies any such suggestion, as the obligations contained therein applies not only to "all indemnity obligations" but also all "liabilities assumed ... under the terms of this Contract, including, *without limitation*," the preceding paragraphs of the section. (emphasis added).

One of the "liabilities assumed ... under the terms of this Contract" appears in paragraph 7.06 of Exhibit "A". That paragraph clearly allocates the responsibility for damages caused by "mobilization" or "demobilization" of the Rig to Browning, expressly stating that such damages "shall be borne by" Browning. While not expressly using the term indemnity, the provision nevertheless shifts liability for damages to Browning. As such, in its practical application, it is the functional equivalent of an indemnity agreement. *See M.O.N.T. Boat Rental Services, Inc. v. Union Oil Company of California*, 613 F.2d 576, 580 (5th Cir. 1980).

Furthermore, there is no conflict between paragraphs 7.06 and 14.13. Because paragraph 7.06 is both an assumption of liability under the terms of the contract and an indemnity undertaking, paragraph 7.06 must be read in conjunction with paragraph 14.13. Accordingly, Browning's responsibility pursuant to paragraph 7.06 must be construed "without regard to ...

the negligence of any party or parties." Therefore, under a plain reading of these paragraphs, to the extent that the damages at issue were caused by "mobilization" or "demobilization" of the Rig, Browning clearly owes Parker contractual defense and indemnity.

However, paragraph 7.06 applies only to damages caused by "mobilization" or "demobilization" of the Rig. While Parker contends that the Rig movement at issue in this case was a "mobilization" or "demobilization" of the Rig, Browning contends that it was not. The terms "mobilization" and "demobilization" are not defined in the contract; neither the parties nor the court were able to find any jurisprudence defining those terms in the context of the IADC contract.

During oral argument, Parker argued that these terms must be construed in accordance with their customary, plain and ordinary meaning and, that "mobilization" is when a rig is moved to the work site and "demobilization" is when a rig is being moved from the work site. Parker further argued that "mobilization" and "demobilization" are not limited, as suggested by Browning, to a rig's first and final movement to and from the work site when the job initially begins and finally ends. Under this definition, Parker contends the movement of the Rig from the work site to safe harbor in anticipation of Hurricane Katrina was a "demobilization" of the Rig to which paragraph 7.06 applies.

Browning's position, as articulated during oral argument and in its supplemental pleadings, is that temporarily moving a rig off of a work site to safe harbor during a hurricane and then back again is neither "mobilization" nor "demobilization" of the rig, as those two

10

terms are used in this contract. Therefore, Browning contends that paragraph 7.06 is inapplicable. Rather, Browning asserts that such temporary rig movements during a hurricane are governed under paragraph 7.04, the only paragraph specifically addressing hurricanes and severe weather situations. While Browning concedes that paragraph 7.04 makes it responsible for the tug costs and the "rig moving rate" in the event the rig has to be moved to safe harbor, Browning argues that the paragraph does not provide for any indemnity, much less provide for indemnity to Parker even if Parker is at fault.

The court concludes that the movement of the Rig in question here was neither a "mobilization" nor "demobilization" of the Rig. Accordingly, paragraph 7.06 does not apply. Rather, the Rig movement herein is governed by paragraph 7.04 of the contract, which paragraph specifically addresses temporary movement of the Rig to safe harbor during a hurricane. The court reaches this conclusion based on the wording of the contract itself (construing the words of the contract as having their ordinary and customary meanings), reading the contract as a whole and the rules of contractual interpretation set forth above.

Paragraph 4 of the contract provides the various "Day Work Rates" that are to be paid by Browning to Parker. For "mobilization", Browning was responsible for the marine equipment required to "mobilize rig to location"; the mobilization point was "Amelia LA". (¶ 4.1). During the time that the rig was in transit to the drill site, Browning owed Parker a day rate of $20,250; the full day rate of $22,500 was to began when the rig arrived "at location". "Infield" moves were to be paid at the full "day rate". (¶ ¶ 4.1, 4.3 and 4.4).

For "demobilization", the contract provided as follows:

"Day rate shall cease when tanks & compartments are cleaned & rig is free-floating & clear of key well on *final well*. Demobilization point: Amelia LA." ¶ 4.2 (emphasis added).

From the plain wording of the contract, as set out above, it is clear that the movement of the Rig to safe harbor in anticipation of Hurricane Katrine was not "mobilization". The Rig had already been moved from Amelia (the "mobilization point") to "location" in Lake Verrett where drilling operations were taking place when Katrina began to approach. Once the Rig was moved from Amelia to "location" in Lake Verrett and set up at the initial well drilling site, "mobilization" was over. Therefore, the real issue is whether, at the time of the allision, the Rig was being "demobilized".

The contract clearly contemplates multiple well drilling sites, as evidenced by the "infield moves" dayrate which differs from the dayrate applicable to out of field Rig "movements". The only Rig movement which constitutes "demobilization", however, is that movement which occurs after the Rig is clear of the "*final well*". Clearly, when the Rig was moved prior to Hurricane Katrina, it was not being moved from the "*final well*". To the contrary, after Katrina passed, the Rig was to be returned to Lake Verrett for additional drilling. Thus, the Rig was never "clear of" the "final well".

Although the Rig was bound for Amelia, the "demobilization point", the Rig was not bound for Amelia in order to be demobilized after clearance from the "final well". Rather, the Rig was being temporarily moved to Amelia to avoid Hurricane Katrina, after which the Rig

12

was to be returned for resumed operations.  As such, the Rig movement at issue herein was clearly not "demobilization" of the Rig as contemplated by the express terms of the contract. Rather, the Rig movement which resulted in the allision between the Rig and the Bridge was a movement because the "conditions require[d] the rig to be moved off of Operator's location to safe harbor and back again", as provided for in paragraph 7.04.

Further, comparison of the applicable dayrates supports the court's conclusion.  All out of field movements are compensated at the same rate, that is, the lesser Rig "moving rate" of $20,500; "infield moves", that is, those occurring within the field between drill sites, are compensated at the full day rate of $22,500.  While the rate applicable to both "mobilization" and "demobilization" movements and movement to safe harbor during a hurricane or severe weather are the same (*see* ¶ 4.3 and ¶ 7.04), the reason for that lesser rate is obvious: both types of movements are movements out of the oilfield, when regular drilling operations have either ceased or have been temporarily suspended.  Those types of movement differ from those which occur "infield" when operations are ongoing as part of the normal and regular work of the rig, and hence, are compensated at the rate applicable to regular full workdays.

The Court's conclusion is further supported by the general principles of contractual interpretation set forth above. During oral argument, Parker conceded that paragraph 7.06 is not a subdivision of paragraph 7.04 entitled "Hurricane/Severe Weather" but rather is a separate and independent provision.  Unlike paragraph 7.06, it is clear that paragraph 7.04 does not contain any provision for the assumption or shifting of liability for damages during movement

13

to safe harbor, nor does it contain any indemnity agreement. To the contrary, paragraph 7.04 only provides that Browning is responsible for the costs associated with moving the Rig to safe harbor. As noted by the Fifth Circuit, however, being "responsible" for a task, or in this case, being responsible for the cost of a task, does not define one's liability for accidents or damages which may occur during performance of the task. *Louisiana Land and Exploration Co.*, 23 F.3d at 969.

Paragraph 7.04 does not define the liabilities of the parties. Rather, allocation of liability for damages is governed under Section 14 and paragraph 7.06 of the contract. However, neither Section 14 nor paragraph 7.06 of the contract contains any allocation, or shifting, of the risk of damage caused by the temporary movement of the Rig to safe harbor during a hurricane or severe weather to Browning, nor do they impose any indemnity obligation on Browning for such damages. Accordingly, the indemnity obligation set forth in paragraph 14.13, permitting an indemnitee to recover from an indemnitor for the indemnitee's own negligence, cannot be read to apply to paragraph 7.04. The obligations of paragraph 7.06 stand alone.

In the absence of a clear and unequivocal expression purporting to protect Parker against the consequences of its own negligence during Rig movement to safe harbor during a hurricane, as is the case herein, under the rules for interpretation of indemnity provisions in maritime contracts, paragraph 14.13 cannot be enforced against Browning as Parker suggests. *See Corbitt, Todd Shipyards* and *Seal Offshore, supra*. Shifting the risk for liability and damages to

Browning do not reasonably appear to have been within the contemplation of the parties under the facts of this case. *See Theriot, supra*.

Furthermore, this court's decision is consistent with a fundamental axiom of contractual interpretation: this court must apply the more specific provision (¶ 7.04) over the conflicting more general provisions contained in Section 14 and paragraph 7.06 of the contract. Paragraph 7.04 contains no indemnity obligation nor any assumption of liability for damages sustained during Rig movement as a result of a hurricane or severe weather. Accordingly, that paragraph is inconsistent with the more general indemnity provisions contained in Section 14 and paragraph 7.06 of the contract. As such, paragraph 7.04, the more specific provision, must prevail. *See Baton Rouge Oil and Chemical Workers' Union, United Postal Service,* and *Consolidated Grain & Barge Co.* citing *Marine Overseas Services, supra.* Indeed, the contract itself requires this result, as it specifically provides that in the case of conflict between those provisions in Exhibit "A", which provisions include paragraph 7.04, and any other provision in the contract, Exhibit "A" will govern. ¶ 7.19.

Finally, while this court finds the contract unambiguous, to the extent that the contract may be found to be ambiguous, it is clear that the contract must be construed against Parker, the drilling contractor, who drafted its text. *See* Restatement (Second) of Contracts § 206 (1981) (derived from § 236(d) of the Restatement (First)); *BP Marine Americas v. Geostar Shipping, Co. N.V.*, 1995 WL 131056, *4 (E.D.La. 1995) *citing Tenneco, Inc. v. Greater LaFourche Port Comm'n*, 427 F.2d 1061, 1065 (5th Cir. 1970) *citing* Restatement of Contracts (First) § 236(d)

15

(1932) and § 206 of the Restatement (Second).  The contract is written on the standard International Association of Drilling Contractors Drilling Bid Proposal and Daywork Drilling Contract form. Parker is the "contractor".  Additionally,  paragraph 7.04 appears in the "Special Provisions" of Exhibit "A" to the contract entitled "Contractor's Other Provisions."  If Parker, the "contractor", intended that Browning be responsible for damages resulting from Rig movement during a hurricane or severe weather caused solely, or in part, by Parker's own negligence, Parker should have included that language in the provision it drafted to addresses that specific situation.  This Parker failed to do.

     In conclusion, reading and interpreting the contract as a whole, including exhibit "A" thereto, and giving the words their plain and ordinary meaning, it is clear that the contract does not provide for any shifting of liability, nor for any indemnity, for damages which occur when the Rig is moved as a result of a hurricane or severe weather.  Therefore, in the absence of an express provision that unequivocally grants Parker a right of indemnity, this court must conclude that Parker is not entitled to contractual indemnity from Browning.  Browning does not owe Parker indemnity and/or defense in this case.  Judgment will be entered in favor of Browning Oil Company.

     November 21, 2007, Lafayette, Louisiana.

*C. Michael Hill*
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE